UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DAN'S HAMPTONS LLC,

                    Plaintiff,

        -against-

AGENCY 21 CONSULTING, LLC,

                    Defendant.

Case No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Dan's Hamptons LLC ("Dan's" or "Plaintiff"), by and through its attorneys, Abrams Fensterman, LLP, as and for a Complaint against the defendant, Agency 21 Consulting, LLC ("A21" or "Defendant"), alleges as follows:

**SUMMARY OF THE ACTION**

1.      Dan's is an iconic brand on the East End of Long Island.  It publishes news and information about the Hamptons and the North Fork communities, specializing in high-end events and attractions.  Dan's has also for twelve years organized events on the East End, catering to tastemakers and influential businesspeople and celebrities, featuring upscale food and drinks catered by many of the best restaurants and chefs in the region.  These events are known as Dan's Taste of Summer, which include events such Dan's Rose Soiree, Dan's Chefs of the Hamptons, Dan's Chefs of the North Fork, Dan's Grill Hampton, Dan's Taste of Two Forks, Dan's Bubbles and several others.

2.      This case arises from a breach of an Event Management Agreement ("EMA") entered into by Dan's and A21 in 2022, pursuant to which Dan's outsourced to A21 part of the logistics of organizing Dan's events and part of its sponsorship and marketing operations.  Pursuant to the EMA, A21 undertook confidentiality and non-compete obligations which it has breached by, among other things, misappropriating Dan's valuable customer data.

3.      After a years' long relationship between Dan's and A21, in March 2023, A21 purported to terminate the EMA, as planning was underway for the Summer 2023 season.

4.      At the same time it purported to terminate the EMA, A21 stated its intention to compete with Dan's and put on its own events in the Hamptons and the North Fork, soliciting the restaurants that participate in Dan's events. Dan's has spent more than a decade, at great expense, cultivating relationships with these restaurants and the in-demand chefs who work there. A21 was paid by Dan's to collect and organize the names, contact information and headshots of these chefs on behalf of Dan's. A21 has used Dan's confidential and proprietary information in breach of the EMA.

5.      In addition, A21 has accessed and misappropriated Dan's customer list, consisting of more than 7,000 unique customers, complete with email and other contact information. This misappropriation is in breach of the EMA. This proprietary and confidential information was obtained by Dan's at great expense, and protected from public disclosure. Indeed, Dan's specifically included confidentiality and non-compete provisions in the EMA to protect its confidential and proprietary information. A21 has breached the EMA, has not paid Dan's for Dan's valuable confidential and proprietary customer list, and has no right to use it.

6.      This action seeks to hold A21 accountable for its breaches of the EMA and its other violations. Accordingly, Dan's seeks court intervention and asserts causes of action for breach of contract, unjust enrichment, violation of the Defense of Trade Secrets Act, and unfair competition, as well injunctive relief to prevent A21 from using Dan's confidential and proprietary information.

## PARTIES, JURISDICTION AND VENUE

7.      Plaintiff, Dan's Hamptons, LLC, was and still is a domestic limited liability company, organized and existing under the laws of the state of New York, and maintains its principal place of business at One Metrotech Center North, 3rd Floor, Brooklyn, New York 11201.

8.      Joshua Schneps ("Mr. Schneps"), is the Publisher, Manager and Member of Plaintiff.  Mr. Schneps's mother and business partner, Victoria Schneps, is also a Manager and Member of Plaintiff.  All members of Plaintiff are residents of the State of New York.

9.      Upon information and belief, Defendant, Agency 21 Consulting, LLC, was and still is a foreign limited liability company, organized and existing under the laws of the state of Florida, and maintains its principal place of business at 5999 Biscayne Boulevard, Miami, Florida 33137.

10.     Upon information and belief, all member(s) of A21 are residents of the State of Florida.

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000.  This Court also has jurisdiction over this matter pursuant to the Defend Trade Secrets Act ("DTSA"), 18 USC §§ 1836(c).

12.     Venue is proper based on Section 17(b) of the EMA, which provides that "[a]ny legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder shall be instituted exclusively in the federal courts of the United States or the courts of the State of New York in each case located County of either Nassau or Suffolk, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit action, or proceeding."

## FACTS COMMON TO ALL CAUSES OF ACTION

**A.     Background of the Parties' Relationship**

13.     Dan's combines various services, including print, websites, live events and a suite of innovative digital, mobile and social marketing solutions catering to the needs of locals, residents and visitors to the Hamptons and the North Fork communities on Long Island.

14.     Among other things, Dan's organizes "Dan's Taste of Summer," which are food-and-wine events in the Hamptons and on the North Fork that reflect the culture of Long Island's East End.  They are among the premier events of the summer season, frequented by local and international tastemakers, influential business leaders, celebrities, and young professionals, drawing an audience of the most sought-after guests and sponsors who come back year after year.

15.     Dan's owns the assets of Dan's Papers, which Dan's acquired in 2019.  Dan's Papers has been a mainstay publication on Long Island's East End for more than 60 years, publishing news and opinions of interest to the Hamptons and North Fork communities.

16.     Dan's also maintains www.DansPapers.com, the leading website catering to the Hamptons, with approximately 200,000 unique visitors a month, providing a wide array of information to visitors and locals about events and destinations in the East End.

17.     Upon information and belief, A21 is an event planning agency, which produces events on behalf of its clients, sells sponsorships to other companies' events and hosts their own events.  Among other things, A21 handles operations, marketing, sales and sponsorships for the events.

18.     Dan's paid A21 to, among other things, market Dan's events on Long Island, sell tickets, and develop a list of ticket-buying customers and sponsors in connection with Dan's events.

4

**B.**     **The 2022 Event Management Agreement**

19.     On or about March 11, 2022, Dan's and A21 entered into the EMA.   A21 acknowledged the EMA in an email dated March 11, 2022, from Lauren Cedeno ("Cedeno"), Associate, Operations for A21 with Brett Friedman cc'd on each of these communications.

20.     The EMA was to remain in effect from the effective date, March 11, 2022, through September 30, 2024.

21.     As set forth in the EMA, Dan's engaged A21 to provide management, production and/or sponsorship sales services for seven specific events ("Events"): (a) Taste the Greats: Nassau County; (b) Chefs of the Hamptons; (c) Chefs of the North Fork; (d) The Rose Soiree; (e) Taste the Greats: Suffolk County; and (f) Grill Hampton Bubbles.

22.     Under the EMA, Dan's was to pay A21 a Management Fee, Sponsorship Incentive Fees, and Marketing Fees.[1]

23.     Specifically, under Section 5(a) of the EMA, Dan's was to pay A21 a management fee on the dates and by method of payment specified in the EMA.

24.     The EMA provides the Marketing Fees due to A21 for each Event, as specified in the EMA.

25.     With respect to the Sponsorship Incentive Fees, pursuant to Section 5(b) of the EMA, A21 would receive a percentage of a performance fee for any sponsorship secured, and Dan's would receive the rest of that fee.   Sometimes the sponsors would pay A21, and A21 would remit Dan's fee to it, or vice versa.

---

[1] The EMA provides that the financial terms of the agreement are confidential.   Therefore, out of an abundance of caution, Dan's has not included the specific payment terms in this complaint.

26.     Additionally, with respect to Marketing Fees, Dan's was required to pay a marketing fee of $25,000 to A21 to perform marketing services and manage ticket sales for promotion and ticket sales for Dan's Events.

27.     Importantly, in what was an addition to the 2019 EMA, the EMA contains a more robust confidentiality provision.  Section 13 of the EMA now requires, among other things, that A21 keep confidential Dan's non-public information, including but not limited to, Dan's "email lists and the attendee data."  A21 agrees to maintain Dan's confidential information "in the strictest confidence and keep the same in a safe, secret and secure manner retaining all such confidential information in trust in a fiduciary capacity for the sole and exclusive benefit of" Dan's.

28.     As importantly, the EMA also adds a "Non-Compete/Non-Solicitation" provision, which had not been included in the 2019 EMA.  Section 13(a) of the EMA thus prohibits A21 from competing with any event run by Dan's for 18 months after the termination of the EMA.  It also prohibits A21 from soliciting Dan's sponsors and employees for 18 months after the termination of the EMA.

29.     Dan's bargained for and received the confidentiality and non-compete provisions in the EMA specifically to protect, among other things, Dan's proprietary assets regarding customer and ticketholder information located on the squadUP.com website.  Dan's had agreed to provide A21 with password access to Dan's squadUP.com account to allow A21 to more efficiently market and manage Dan's events.  Thus, along with the trust Dan's was placing in A21, Dan's took these specific contractual measures in the EMA to protect its proprietary information from being misappropriated.

30.     Section 15(a) of the EMA provides that either party may terminate the EMA if the other party materially breaches the EMA and is unable to or fails to cure such breach, or if any

representation or warranty made by the non-terminating party in the EMA is materially false or misleading.

31.     Section 15(e) of the EMA provides for the terms of the cancellation of an Event by Dan's, permitting such cancellation up to 90 days before the event is scheduled to take place.

C.     **Performance Under the EMA**

32.     A21 took over management of the squadUP.com database for ticket sales for each of Dan's seven Events throughout the Summer of 2022, as well as managing Dan's sponsors for each Event.

33.     In accordance with the EMA, A21 sent invoices to Dan's for payment of the agreed upon Marketing Fees.

34.     Dan's made significant investments in advertising and marketing to sell tickets to its events.  For example, Dan's expended approximately $100,000 in print and digital advertising in its owned and operated media.  Dan's also expended approximately $40,000 on Facebook and Instagram advertisements, as well as approximately $17,000 on billboard advertising and approximately $5,723 on Newsday advertisements.

35.     In the Summer of 2022, the Events set forth in the EMA were all successful.  Dan's earned approximately $114,235 in profit from all seven Events.

36.     Throughout 2022 and the beginning of 2023, A21 submitted invoices to Dan's for A21's management and marketing fees, in accordance with the Payment Schedule set forth in the EMA.

37.     A21 also submitted reimbursement expenses to Dan's in accordance with the EMA. For example, on or about September 12, 2022, A21 submitted an invoice to Dan's for "tent fees" and "lighting/generator fees."

38.     The foregoing invoices were all timely paid by Dan's.

39.     A21 similarly submitted invoices to Dan's for its sponsorship fees provided for by Section 5(b) of the EMA.

40.     Dan's timely paid each invoice submitted by A21 for each payment, commission or expense owed to A21 under the EMA.

41.     Dan's has paid A21 in excess of approximately $1 million over the course of their twelve-year relationship.

42.     At all relevant times, Dan's performed its obligations under the EMA.

**D.     A21 Purports to Terminate the EMA**

43.     For the Summer of 2023, Dan's was focused on finding new venues to host its largest events in order to leverage its community relationships and bring down the cost of rent and infrastructure needed to host the events. Dan's entered into a verbal agreement for a new location for two back-to-back events, Grill Hampton and Taste of Two Forks, tentatively planned for August 5 and 6, 2023 at a venue in East Hampton.

44.     Since A21 was assisting Dan's with operations, A21's owner and Chief Executive Officer, Brett Friedman ("Mr. Friedman") asked to be on a call with the venue owners prior to Dan's signing the venue rental agreement.  Mr. Friedman was provided with the terms of the proposed agreement prior to the call for his review.

45.     On or about March 10, 2023, Mr. Schneps and Mr. Friedman had a call with the venue owners.  During that call, Friedman asked the prospective venue owners about hosting an A21 art fair, even though Mr. Schneps was participating in the call and the subject was supposed to be Dan's events, which A21 was contracted to organize.  Friedman further asserted to the venue owners that the venue would have to accommodate an event for up to 2,000 guests, even though

Dan's has not yet put on an event with more than 1,200 guests and the proposed contract with the venue owners which was shared with Mr. Friedman before the call provided for far fewer than 2,000 guests.

46.     Shortly after the March 10 call, Mr. Schneps told Mr. Friedman that Mr. Friedman's behavior during the March 10 call was unacceptable, i.e., Mr. Friedman raising A21's event when the meeting was intended to discuss Dan's event, for which Dan's was paying A21.  Mr. Schneps further stated that Mr. Friedman had not acted in the interest of Dan's and negatively impacted the opportunity for Dan's events to take place at this venue.  Nonetheless, Mr. Schneps advised Mr. Friedman that he was willing to continue the relationship between Dan's and A21.

47.     On or about March 15, 2023, the owners of the prospective venue informed Mr. Schneps that they were no longer interested in hosting the two proposed Dan's events in August 2023.  The venue owners stated that, based on the March 10 call, it appeared to them that Mr. Friedman was not "aligned" with the agreement that had been proposed to them by Mr. Schneps.

48.     Having lost this venue, Dan's determined that the planned August 2023 events had become untenable based on both timing and cost. In fact, the negotiations for the lost venue had taken more than two months.

49.     Therefore, on or about March 17, 2023, Victoria Schneps and Dan's Chief Operating Officer Cliff Luster advised Mr. Friedman that Dan's had decided to cancel the Grill Hampton Bubbles event slated for August 2023 because it did not seem financially feasible at the time.  Dan's cancellation of the Event was proper under Section 15(e) of the EMA, as it was well in advance of 90 days before the Event was scheduled.

50.     Ms. Schneps and Mr. Luster reiterated to Mr. Friedman Dan's intention to continue to work with A21 and to fulfill its remaining contractual commitments.  Mr. Friedman indicated

that he would assess this information and get back to Dan's on March 21, 2023.

51.    On March 20, 2023, at 3:33 a.m., Mr. Friedman sent an email to Mr. Schneps, Victoria Schneps, and Mr. Luster with the subject line: "Termination of relationship between Schneps Media and agency 21."  Mr. Friedman stated: "I on behalf of agency21 (a21), have decided it is no longer in our best interest to align ourselves with Dans & Schneps Media for Dans Taste of Summer.  Effective immediately, we will cease to engage nor be responsible for any aspects of the events in 2023."

52.    Notwithstanding A21's purported termination of the EMA, however, under the EMA, as noted above, Dan's is permitted to cancel any of the Events at least 90 days before the Event is scheduled to take place.

53.    Mr. Friedman's unilateral decision to terminate the EMA on March 20, 2023 was neither anticipated nor agreed to, and was in breach of the EMA.  Specifically, under Section 15(a) of the EMA, A21 could terminate the EMA only in the event that Dan's was in breach of the EMA or had made a materially false representation or warranty in the EMA.  A21 has not alleged, and cannot allege, that Dan's was in breach of the EMA or had made a materially false representation or warranty in the EMA.

54.    Dan's has been damaged as a result of A21's termination of the EMA in breach of the EMA.  Dan's first planned event of the 2023 season, The Rose Soiree, was scheduled for May 28, 2023.  In 2022, Dan's earned approximately $162,000 in sponsorship sales for The Rose Soiree. For 2023, Dan's has earned approximately $63,333 in sponsorship sales for The Rose Soiree, a difference of approximately $98,667.  This decrease in sponsorship sales for The Rose Soiree is attributable to A21's improper termination of the EMA, which caused Dan's to be without a marketing and sponsorship agent leading up to The Rose Soiree.

### E.      A21 Misappropriates Dan's Confidential and Proprietary Customer and Vendor Lists in Breach of the EMA

55.      The foundation of Dan's successful business in organizing food and wine events is comprised of three main components.

56.      First, it has expended significant resources to build and maintain a large database of customers who have purchased tickets to Dan's events over the course of at least twelve years of organizing and hosting events.  Dan's has contact information and other data in connection with at least 20,658 tickets sold to Dan's events, including at least 7,000 unique customer emails.  This data is a valuable asset of the company, worth at least $900,000.

57.      Second, Dan's has cultivated relationships with the most sought-after restaurants and chefs on Long Island.  The Hamptons is a small and competitive market for restaurants and chefs to participate in summer events and festivals.  Many chefs will only commit to one or two events per summer season because it is a significant commitment of time during the busiest season of the year for their restaurants.  Dan's has contact information for and relationships with chefs who are not easily accessible, and the contact information Dan's has for managers and owners of restaurants includes information that is not publicly available.  This information and these relationships with the most highly regarded restaurants and chefs is another of Dan's valuable proprietary assets, for which Dan's has expended considerable money, including, among other things, hiring restaurant consultants to recruit and work with restaurants and chefs, as well as paying A21 to organize and manage Dan's roster of restaurants and chefs.

58.      Third, Dan's relies on its sponsorship deals with various companies which partner with Dan's to sponsor its events.  Pursuant to the EMA, Dan's paid A21 commissions for obtaining sponsorship deals.

11

59.     Of these three key components to build a successful food-and-wine events company, A21 has lacked the first two.  After its purported termination of the EMA, A21 used its access to Dan's proprietary information to build its own events business at Dan's expense, in breach of the EMA.

60.     Specifically, A21 began reaching out to restaurants and chefs that had participated in Dan's past events, informing them that A21 was no longer working with Dan's and that A21 would be hosting other events in the Hamptons this summer.

61.     On March 20, 2023, the same day as A21's purported termination of the EMA, Christine Kim, Senior Associate, Event Operations at A21, sent an email addressed to "Chef," which stated that "effectively immediately a21 is no longer affiliated with Dan's Papers and will not be moving forward in the planning of Rosé Soirée or any other Dan's Taste Events."  Kim continued that "Hamptons events are not over for us. a21 will be producing culinary events out East later this summer and we hope to include you on the roster."

62.     Kim's email was clearly addressed to the various chefs and restaurants that were committed to participate in Dan's Events, and was intended to solicit their participation in A21's upcoming events.  This competitive conduct is expressly prohibited by Section 13(a) of the EMA for 18 months following the EMA's termination.

63.     A21's solicitation of the restaurants and chefs was also a breach of Section 13 of the EMA because A21 was using its access to Dan's confidential and proprietary list of restaurants and chefs, including their emails and other contact information, for A21's own benefit, which is prohibited by Section 13 of the EMA.

64.     A21's solicitation of Dan's restaurant and chef vendors is acutely detrimental to Dan's business.  Part of A21's contractual obligation was to work with a consultant hired by Dan's

to organize the chefs and restaurants that committed to participate in Dan's Taste of Summer events.  A21 was trusted to collect the chefs' contact details, their headshots, and images and logos of participating restaurant.  Subsequent to A21's purported termination of the EMA, it has refused to provide access to this proprietary information belonging to Dan's, despite repeated requests by Dan's to return such information.  To the contrary, A21 has used Dan's proprietary information to solicit the restaurants and chefs to participate in A21's own events.  A21's attempt to organize its own events in competition with Dan's using Dan's confidential and proprietary information, in breach of the EMA, could have the effect of putting Dan's out of business.

65.     A21 is also prohibited from disclosing, and using for its own competitive benefit, Dan's proprietary information, including Dan's customer and attendee data.

66.     Upon information and belief, in breach of Section 13 of the EMA, A21 is using Dan's confidential and proprietary customer lists and attendee data, and its vendor lists, to advance its own events.

67.     Specifically, A21 has obtained, and refuses to disclaim use of, Dan's customer data from the squadUP.com website, including the email addresses of all ticket purchasers to Dan's previous events.  This information was password protected and not available to the public.  Since on or about March 11, 2022, the beginning of the term of the EMA, A21 in its capacity as a service provider to Dan's, has had the login and password to Dan's customer list and contact information located on the squadUP.com website.  The login and password to Dan's data was not publicly available and only available to A21 to permit A21 to perform its obligations under the EMA.

68.     A21 has thus gained access to information in connection with 20,658 tickets sold to Dan's events, with all of the ticket buyer data, including at least 7,000 unique customer emails. This data represents at least $900,000 in event ticket sales.

13

69.     For example, upon information and belief, on or about May 30, 2023, A21 used Dan's confidential and proprietary customer contact information to send a mass email to prospective customers for an A21 event called "Chefs Making Waves, A Food, Wine & Spirits Festival at Sea," which is scheduled to take place March 25 through 29, 2024.  Upon information and belief, based upon the identity and email address of at least one recipient of this email that is known to Dan's, A21 could not have obtained such information but for its use of Dan's confidential and proprietary customer contact information.

70.     Dan's has requested that A21 desist from using Dan's confidential and proprietary information for A21's own benefit.  A21 has refused to make such assurances.

71.     A21's unauthorized misappropriation of Dan's confidential and proprietary customer information has caused, and will continue to cause, Dan's significant and irreparable harm.  Dan's has spent at least twelve years investing in identifying and cultivating its more than 7,000 unique customers.  It has expended at least $500,000 just in 2022 for, among other things, consulting fees, marketing and advertising and fees to A21 to obtain its confidential and proprietary list of customers.  These customers lists are a valuable asset of Dan's because they represent the future attendees of Dan's events and the data is used to target potential customers—so-called "look-alike" audiences—on social and other media.

72.     If A21 were to continue using Dan's confidential and proprietary information to solicit Dan's customers and restaurant vendors, it would also cause significant confusion in the marketplace, whereas until now, Dan's has been a respected and unique brand with regard to the upscale food-and-wine event market in Long Island.  The result of A21's continued use of Dan's confidential and proprietary information would be the possible end of Dan's business.

**F.**   **A21's Additional Breaches of the EMA**

73.     A21 is in possession of, and refuses to disclaim the use of, Dan's lists of sponsors for its events.  Upon information and belief, A21 will use that list for its own benefit to obtain sponsorships for A21's events.  This constitutes a breach of Section 13 of the EMA.

74.     A21 has also failed to pay Dan's money due to Dan's.  Specifically, Dan's had already made an initial payment for A21's fees for March 2023 in the amount of $20,000.  A21 requested that a portion of that amount be credited to A21 as reimbursement to A21 for amounts expended by A21 in connection with Facebook advertising purchased for Dan's and paid for by A21.  Dan's consented to applying such a credit, resulting in the amount of $8,989.42 having been paid by Dan's to A21 for March 2023.  Given A21's termination of the EMA, A21 must refund this amount to Dan's.

75.     In addition, as of March 30, 2023, Dan's has not been paid its percentage of sponsorship fees from Manhattan Beer that is owed to Dan's under Section 5(b) of the EMA.  Upon information and belief, Dan's is owed $26,250 for its sponsorship from Manhattan Beer.

76.     Based on the above, A21 owes Dan's an amount of not less than approximately $35,239.42, plus applicable interest.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

77.     Plaintiff repeats and realleges each and every allegation set forth above.

78.     Dan's and A21 entered into the EMA on or about March 11, 2022.

79.     A21 acknowledged receipt of the EMA via email on March 11, 2022.

80.     A21 performed in accordance with the EMA since March 11, 2022 until its breaches of the EMA.

81.     At all times, Dan's has performed all of its obligations under the EMA.

82.     Pursuant to Section 13 of the EMA, A21 is not permitted to disclose or use proprietary information belonging to Dan's other than what is provided for in the EMA.

83.     Under Section 13(a) of the EMA, A21 is not permitted to compete with Dan's throughout the contract term and for a period of 18 months after the EMA is terminated.

84.     A21 has used Dan's confidential and proprietary data concerning the best restaurants and chefs in the region to solicit them to participate in A21's events in competition with Dan's, in breach of the EMA.  A21's solicitation of Dan's restaurants and chefs is detrimental to Dan's business.  Dan's has spent years cultivating these chefs and restaurants, and compiling their non-public contact information, at great expense, for the benefit of Dan's events.  A21 has not paid Dan's for access to Dan's confidential and proprietary information.  A21 has refused to provide access to this confidential and proprietary information, despite repeated requests by Dan's to return such information.

85.     Furthermore, A21 has gained access to, and has been using Dan's confidential and proprietary customer and ticket sales information from the squadUP.com website to solicit customers for A21's own events, in breach of the EMA.

86.     This data consists of at least 7,000 unique customer emails and represents at least $900,000 in event ticket sales.

87.     For example, upon information and belief, on or about May 30, 2023, A21 used Dan's confidential and proprietary customer contact information to send a mass email to prospective customers for an A21 event which is scheduled to take place in 2024.  Upon information and belief, A21 could not have sent such a solicitation but for its use of Dan's confidential and proprietary customer contact information.

88.     Dan's has spent approximately $200,000 in 2022 to generate leads for ticket sales and sponsorships for its events.

89.     Upon information and belief, A21 is planning to host events that compete with Dan's events, in breach of the EMA.

90.     A21's termination of the EMA without cause is a further breach of the EMA.  Dan's first planned event of the 2023 season, The Rose Soiree, was scheduled for May 28, 2023.  As a result of A21's improper termination of the EMA, which caused Dan's to be without a marketing and sponsorship agent leading up to The Rose Soiree, Dan's has lost at least $98,667 in sponsorship sales for The Rose Soiree.

91.     Pursuant to Section 5(a) of the EMA, Dan's made payment to A21 for March 2023 in the amount of $8,989.42 for Management Fees.  A21 has failed to remit that payment back to Dan's in breach of the EMA.

92.     Pursuant to Section 5(b) of the EMA, A21 was required to remit to Dan's a percentage of the sponsorship fees paid to A21 on Dan's behalf within 14 calendar days of receipt.  A21 has failed to pay Dan's $26,250 for Dan's Manhattan Beer sponsorship, in breach of the EMA.

93.     Based on the foregoing, A21 is in breach of the EMA and Dan's has been damaged in an amount to be determined at trial, including, but not limited to, a loss of customers, loss of leads, lost profits on the sales diverted to A21's competing events, the loss of future profits from Dan's customers and prospective leads, and a significant diminution in the value of Dan's confidential and proprietary information, its reputation and its goodwill, in an amount not less than approximately $1,233,906.42, plus reasonable attorneys' fees, and all applicable interest, which has accrued and is accruing.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Unjust Enrichment)

94.    Plaintiff repeats and realleges each and every allegation set forth above.

95.    Dan's has spent approximately $200,000 in 2022 to generate leads for ticket sales and sponsorships for its events.

96.    A21 has gained access to Dan's proprietary lists of customer and sponsorship contacts through the squadUP.com website, without paying for the same.

97.    This data consists of at least 7,000 unique customer emails and represents at least $900,000 in event ticket sales.

98.    For example, upon information and belief, on or about May 30, 2023, A21 used Dan's confidential and proprietary customer contact information to send a mass email to prospective customers for an A21 event which is scheduled to take place in 2024.   Upon information and belief, A21 could not have sent such a solicitation but for its use of Dan's confidential and proprietary customer contact information.

99.    A21 has also used Dan's confidential and proprietary data concerning the best restaurants and chefs in the region to solicit them to participate in A21's events in competition with Dan's, in breach of the EMA.  A21's solicitation of Dan's restaurants and chefs is detrimental to Dan's business.  Dan's has spent years cultivating these chefs and restaurants, and compiling their non-public contact information, at great expense, for the benefit of Dan's events.  A21 has not paid Dan's for access to Dan's confidential and proprietary information.  A21 has refused to provide access to this confidential and proprietary information, despite repeated requests by Dan's to return such information.

100.    In addition, following its improper termination of the EMA, A21 has not returned Dan's payment of $8,989.42, which was inadvertently paid by Dan's to A21.

101.    A21 has also failed to pay Dan's its share of sponsorship fees in the amount of not less than $26,250.

102.    As a result, A21 has been unjustly enriched in an amount to be determined at trial, including, but not limited to, a loss of customers, loss of leads, lost profits on the sales diverted to A21's competing events, the loss of future profits from Dan's customers and prospective leads, and a significant diminution in the value of Dan's confidential and proprietary information, its reputation and its goodwill, plus reasonable attorneys' fees, and all applicable interest, which has accrued and is accruing, in an amount not less than approximately $1,135,239.42.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unfair Competition)

103.    Plaintiff repeats and realleges each and every allegation set forth above.

104.    Dan's has spent approximately $200,000 in 2022 to generate leads for ticket sales and sponsorships for its events.

105.    A21 has gained access to Dan's proprietary lists of customer and sponsorship contacts through the squadUP.com website, without paying for the same.

106.    This data consists of at least 7,000 unique customer emails and represents at least $900,000 in event ticket sales.

107.    For example, upon information and belief, on or about May 30, 2023, A21 used Dan's confidential and proprietary customer contact information to send a mass email to prospective customers for an A21 event which is scheduled to take place in 2024.   Upon information and belief, A21 could not have sent such a solicitation but for its use of Dan's confidential and proprietary customer contact information.

108.    A21 has also misappropriated Dan's confidential and proprietary data concerning the best restaurants and chefs in the region to solicit them to participate in A21's events in

competition with Dan's, in breach of the EMA.  Dan's has spent years cultivating these chefs and restaurants, and compiling their non-public contact information, at great expense, for the benefit of Dan's events.  A21 has not paid Dan's for access to Dan's confidential and proprietary information.

109.    The lists of customers, leads, chefs and restaurants were developed by Dan's over a period of more than a decade at a great cost and with great effort, and constitute trade secrets.  Such lists contain information that is not publicly available concerning Dan's past customers and potential future customers, as well as non-public information concerning the most sought-after chefs and restaurants in the region.

110.    The lists were developed by and for the benefit of Dan's at its own expense.  At all relevant times, the lists were the exclusive property of Dan's.

111.    Dan's has spent approximately $200,000 in 2022 to generate leads for ticket sales and sponsorships for its events.

112.    A21 has misappropriated Dan's confidential and proprietary information for A21's competing events.

113.    Such misappropriation by A21 was done in bad faith.  At the time of the misappropriation, A21 and Dan's rights and obligations were controlled by the EMA, and A21 was contracted to manage Dan's events, including being given access to Dan's proprietary and confidential information located on the squadUp.com website and concerning Dan's roster of chefs and restaurants.  A21 misappropriated this data and has not paid Dan's for such data.

114.    Such conduct by A21 was willful, was intended to cause harm to Dan's, and has caused Dan's significant damage in an amount to be determined at trial including, but not limited to, a loss of customers, loss of sponsors, a loss of customer leads, diminished value of its customer

lists, diminished value of its list of chefs and restaurants, and the past payment of compensation to A21 to obtain customers while A21 schemed to appropriate the customer lists for itself.

115.    Dan's confidential and proprietary lists of customer and sponsorship contacts accessible from the squadUP.com website consist of at least 7,000 unique customer emails and represents at least $900,000 in event ticket sales.

116.    A21 is liable to Dan's for the damages caused by A21's unfair competition, in an amount to be determined at trial, including, but not limited to, a loss of customers, loss of leads, lost profits on the sales diverted to A21's competing events, the loss of future profits from Dan's customers and prospective leads, and a significant diminution in the value of Dan's confidential and proprietary information, its reputation and its goodwill, plus reasonable attorneys' fees, and all applicable interest, which has accrued and is accruing, in an amount not less than approximately $1,100,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act)

117.    Plaintiff repeats and realleges each and every allegation set forth above.

118.    Dan's ticket sales for its events is, and at all relevant times has been, a service in interstate commerce.

119.    Dan's data located on the squadUP.com website, including customer lists and prospective leads, are trade secrets as that term is defined in the DTSA, 18 USC §§ 1836(a) and (c).

120.    Dan's has taken reasonable measures to maintain the secrecy of its customer lists and prospective leads, by among other things, protecting such data with password protection on the squadUp.com website.  Dan's customer lists derive independent economic value from being kept confidential and not available to competitors or the public at large.

121.    Dan's data, including customer lists with contact information for such customers and prospective leads, was obtained by A21 using improper means by accessing the lists on the squadUP.com website for A21's benefit, even though A21 was contracted by Dan's to maintain those lists for the benefit of Dan's.

122.    For example, upon information and belief, on or about May 30, 2023, A21 used Dan's confidential and proprietary customer contact information to send a mass email to prospective customers for an A21 event which is scheduled to take place in 2024.   Upon information and belief, A21 could not have sent such a solicitation but for its use of Dan's confidential and proprietary customer contact information.

123.    A21 knew that it had a duty to preserve the confidentiality of Dan's lists and to use them exclusively for the benefit of Dan's.

124.    The conduct of A21 as described above constitutes a misappropriation as that term is used in the DTSA.

125.    A21 has violated the DTSA, for which violation Dan's is entitled to damages and exemplary damages in an amount to be determined at trial, including, but not limited to, a loss of customers, loss of leads, lost profits on the sales diverted to A21's competing events, the loss of future profits from Dan's customers and prospective leads, and a significant diminution in the value of Dan's confidential and proprietary information, its reputation and its goodwill, plus reasonable attorneys' fees, and all applicable interest, which has accrued and is accruing, in an amount not less than approximately $1,100,000.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

126.    Plaintiff repeats and realleges each and every allegation set forth above.

127.    As set forth in Section 13 of the EMA, A21 owes fiduciary duties to Dan's.

128.     A21's fiduciary duty required undivided and undiluted loyalty to, and an obligation to act in the best interests of, and in good faith in any manner relating to, Dan's.

129.     Despite this fiduciary duty, A21 has committed misconduct, mismanagement, and misappropriation in its conduct of Dan's affairs.

130.     A21 knew that it had a fiduciary duty to preserve the confidentiality of Dan's confidential and proprietary information and to use such information exclusively for the benefit of Dan's.   Nevertheless, in breach of that fiduciary duty, A21 has used Dan's confidential and proprietary information for the benefit of A21 and to the detriment of Dan's.

131.     By engaging in the conduct as alleged herein, A21 willfully and maliciously breached its duties to Dan's.

132.     As a direct result of A21's breaches of its fiduciary duties, Dan's has sustained, and will continue to sustain, significant pecuniary injury in an amount to be determined at trial, including, but not limited to, a loss of customers, loss of leads, lost profits on the sales diverted to A21's competing events, the loss of future profits from Dan's customers and prospective leads, and a significant diminution in the value of Dan's confidential and proprietary information, its reputation and its goodwill, plus reasonable attorneys' fees, and all applicable interest, which has accrued and is accruing, in an amount not less than approximately $1,100,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Permanent Injunction)

133.     Plaintiff repeats and realleges each and every allegation set forth above.

134.     A21's wrongful use of Dan's proprietary and confidential information constitutes a breach of the EMA.

135.    A21's stated intention to compete with Dan's events constitutes a breach of the EMA.

136.    In the event A21 is not enjoined from hosting competing events and from using Dan's confidential and proprietary information, Dan's will suffer irreparable injury and does not have an adequate remedy at law.

137.    Dan's customer and sponsor information obtained by A21 is unique to Dan's and Dan's cannot recreate that information through usual public channels.

138.    Dan's has spent hundreds of thousands of dollars generating leads for its events.

139.    Should it lose its customers and vendors, Dan's cannot host events, which is the core of its business.  Without its events, Dan's business would effectively be rendered inoperable.

140.    Moreover, A21's continued use of Dan's confidential and proprietary information will cause significant confusion in the marketplace, and degrade Dan's reputation as a respected and unique brand with regard to the upscale food-and-wine event market on Long Island.

141.    As a result of the foregoing, Dan's is entitled to a permanent injunction: (a) prohibiting A21 from using Dan's confidential and proprietary information and (b) prohibiting A21 from hosting events competing with Dan's events for the period of time provided for in the EMA.

## **DEMAND FOR JURY TRIAL**

142.    Dan's requests trial by jury on all claims so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Dan's Hamptons LLC respectfully requests that the Court enter judgment in Dan's favor and against Defendant A21, as follows:

(1)     Awarding Dan's damages and exemplary damages in an amount to be determined at trial, plus and all applicable interest thereon, which has accrued and is accruing;

(2)     Granting Dan's a permanent injunction prohibiting A21 from competing with Dan's, from using Dan's proprietary and confidential information, and requiring A21 to return Dan's proprietary and confidential information;

(3)     Awarding Dan's its reasonable attorney's fees and expenses; and

(4)     Such other and further relief as the Court may deem just and proper.


Dated: May 31, 2023


**ABRAMS FENSTERMAN, LLP**

By: */s/ Justin T. Kelton*
     Justin T. Kelton
     Mordecai Geisler
     Amanda P. Small
     1 Metrotech Center, Suite 1701
     Brooklyn, New York 11201
     (718) 215-5300
     *Attorneys for Plaintiff*
     *Dan's Hamptons LLC*